**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

| | | |
|---|---|---|
| **United States of America,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Criminal Action Number** |
| | ) | **18-00015-01-CR-W-BP** |
| **Rashidi Crosdale,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

Pending before the Court is the MOTION TO SUPPRESS EVIDENCE AND STATEMENT WITH SUGGESTIONS IN SUPPORT (Doc. #47) filed on March 24, 2019, by defendant Rashidi Crosdale ("Crosdale"). On July 31, 2019, the undersigned held an evidentiary hearing on Crosdale's motion. Crosdale was present and appeared with his counsel S. Chase Higinbotham, Jr. The government was represented by Assistant United States Attorney Matthew Moeder. At the evidentiary hearing, Crosdale testified along with six employees of the Kansas City, Missouri Police Department – Andrew Dorothy, Gwen Merino, Justin Palmer, James Oakes, Jacob Shroyer, and Anthony Castelleto. Additionally, several exhibits were admitted into evidence:

| Number | Description |
|---|---|
| Gov't. #1 | Aerial map |
| Gov't. #2-8 | Photographs |
| Gov't. #9 | KCPD Tow Policy |
| Gov't. #10 | Collision diagram |
| Gov't. #11 | Consent to search |
| Gov't. #12-19 | Photographs |
| Gov't. #20 | *Miranda* waiver |

On the basis of all the evidence adduced at the evidentiary hearing, the undersigned submits the following:

## PROPOSED FINDINGS OF FACT[1]

1.      In January of 2018, Andrew Dorothy and Justin Palmer were sergeants with the Kansas City, Missouri Police Department ("KCPD"), James Oakes and Bobbie King were officers with the KCPD, and Gwen Merino, Jacob Shroyer and Anthony Castelleto were detectives with the KCPD.  Tr. at 5-6, 9, 62-63, 74, 100, 102, 129-30, 137.

2.      On January 5, 2018, Sgt. Dorothy read a report about an armed robbery of the residence located at 1301 East 79th Street in Kansas City, Missouri.  Tr. at 9, 51.

3.      According to the report, three armed black male suspects had entered the residence, threatened the occupants (Mary Patterson and Victor Roseberry), forced the residents to abandon the property, and basically took over the residence.  Tr. at 9, 34, 54.

4.      According to the report, the robbery had occurred in the middle of December of 2017, but had not been reported to the KCPD until January 4, 2018.  Tr. at 10, 33, 52.

5.      After reading the report, Sgt. Dorothy drove past the residence at 1301 East 79th Street and observed a black Malibu parked at the house.  Tr. at 10, 28-29, 52, 59.

6.      Sgt. Dorothy ran a check on the plates for the Malibu and learned that the plates were registered to Izetta Brunson.  Tr. at 10, 29, 55, 59.

7.      After conducting an investigation of Ms. Brunson, Sgt. Dorothy learned that she was involved in a 2017 narcotics investigation and had a boyfriend identified in the records as "Kevin Connor."  Tr. at 10, 30, 36-37, 52, 55, 59.

8.      Sgt. Dorothy ran a computer check on the name "Kevin Connor" and learned that he was wanted on a Jackson County warrant for a parole violation.  Tr. at 10-12, 37, 56.

9.      On January 9, 2018, Sgt. Dorothy briefed other law enforcement officers on his investigation involving the robbery of 1301 East 79th Street and the information obtained about "Kevin Connor."  Tr. at 11-13, 76-77.

10.     With the intent of arresting "Kevin Connor," Sgt. Dorothy dispatched two undercover officers (including Sgt. Palmer) to 1301 East 79th Street to watch the residence and see if any individual entered the Malibu.  Tr. at 12, 31, 76-78.

11.     At approximately 8:30 a.m., Sgt. Palmer observed a black male exit the residence at 1301 East 79th Street and leave in the Malibu.  Tr. at 79-80.

---

[1]      In making these findings, the Court has been required to make some credibility determinations, particularly as between the testimony of the officers and the testimony offered by Crosdale.  In making such determinations, the Court considered (1) the demeanor of the witnesses on the stand, (2) the interest the witnesses had in the outcome of the motion, and (3) the opportunity of the witnesses to hear, observe, and recall what was said or done.  The Court concludes that, in general, where there were conflicts, the officers were more credible witnesses.

12.     The man exiting the residence was similar looking to the photo law enforcement officers had of "Kevin Connor" and generally matched the other identifiers provided to law enforcement officers of "Kevin Connor."  Tr. at 86, 93, 99.

13.     The black male was accompanied by a female juvenile.  Tr. at 79.

14.     Sgt. Palmer began following the Malibu.  Tr. at 80, 94.

15.     After following the Malibu for approximately 14 blocks, Sgt. Palmer observed the Malibu pull into a drive-through line at a McDonald's located at 65th and Troost in Kansas City, Missouri.  Tr. at 81.

16.     At approximately 8:55 a.m., the officers reported to Sgt. Dorothy that they were following the Malibu after they had seen a black male matching Kevin Connor's identifiers drive off in the car.  Tr. at 13.

17.     Sgt. Palmer also communicated by radio with Officers King and Oakes about the Malibu's movements.  Tr. at 82, 103.

18.     Sgt. Palmer – who was in an unmarked patrol car – parked in the McDonald's lot. Tr. at 83, 102.

19.     Officers King and Oakes – who were in a marked police vehicle – pulled in perpendicular to the Malibu in the McDonald's drive-through line.  Tr. at 83-84, 104, 106.

20.     There was a vehicle in front and behind the Malibu in the McDonald's drive-through line.  Tr. at 105-07.

21.     Officers King and Oakes then activated the lights on their patrol car.  Tr. at 105.

22.     After the lights were activated, the Malibu attempted to drive away, hitting the car in front of it in the drive-through line and hitting a guardrail adjacent to the drive-through line. Tr. at 85, 109.

23.     The Malibu then drove across multiple lanes of Troost and into the parking lot of an Aldi's.  Tr. at 85, 110.

24.     The Malibu's driver abandoned the car and began to flee on foot.  Tr. at 110.

25.     Officers King and Oakes gave chase and apprehended the driver near a Family Dollar store on Troost.  Tr. at 110.

26.     After handcuffing the driver, Officer Oakes obtained his driver's license (learning that the driver was Crosdale) and ran a computer check that revealed Crosdale had four outstanding municipal arrest warrants.  Tr. at 111.

27.     Officer Oakes placed Crosdale under arrest for fleeing from the scene of an accident and for fleeing from the police.  Tr. at 112.

3

28.     Sgt. Dorothy arrived at the scene and pulled into the Aldi's parking lot.  Tr. at 15, 32.

29.     Sgt. Dorothy saw the abandoned Malibu in the parking with the driver's door open and a crying girl standing outside the car.  Tr. at 15-16, 33.

30.     Sgt. Dorothy approached the Malibu and looked inside the open driver's door to ensure that there was no one else inside the car.  Tr. at 16.

31.     When he looked in the car, Sgt. Dorothy could see a Glock semiautomatic handgun between the front driver's-side seat and the center console.  Tr. at 17.

32.     In conformity with the KCPD Tow Policy, Sgt. Dorothy made a decision to have the Malibu towed because it had a broken axle, the driver was under arrest, and the vehicle had been used in the commission of a crime.  Tr. at 21-23.

33.     Officer Oakes performed an inventory of the Malibu that disclosed a Glock handgun with an extended magazine, a rifle with a hundred-round clip magazine, and other contraband (including some suspected controlled substances).  Tr. at 112-14.

34.     Following Crosdale's arrest, Det. Merino interviewed both Izetta Brunson (in person) and Mary Patterson (by phone).  Tr. at 62-64.

35.     Ms. Brunson told Det. Merino that she had lived at 1301 East 79th Street with Crosdale since Christmas.  Tr. at 65-66.

36.     Ms. Brunson consented to a search of 1301 East 79th Street both verbally and in writing.  Tr. at 66-67.

37.     Ms. Patterson (one of the residents of 1301 East 79th Street who first reported the robbery of the residence) told Det. Merino that she was the lessee of 1301 East 79th Street and she verbally consented over the phone to a search of the home.  Tr. at 67-68.

38.     Det. Shroyer thereafter undertook a search of 1301 East 79th Street.  Tr. at 132-33.

39.     The search of 1301 East 79th Street found numerous firearms, including a Glock 27 and multiple AK-style assault rifles.  Tr. at 135-35.

40.     Crosdale was subsequently interviewed in the Jackson County Jail by Det. Castelleto.  Tr. at 139.

41.     Prior to the commencement of the interview, Crosdale – both orally and in writing – waived his *Miranda* rights.  Tr. at 140-41.

42.     Crosdale made inculpatory statements during the interview.  Tr. at 142-43.

## PROPOSED CONCLUSIONS OF LAW

In his motion to suppress before the Court, Guzman seeks the suppression of "all evidence, and testimony related to such evidence, obtained as a result of the search and seizure of [Crosdale], his vehicle, and his residence."  After carefully reviewing the motion to suppress, it appears that the sole basis for suppressing:

    (1)    the arrest of Crosdale (effectuated after he was seen leaving the scene of an accident),

    (2)    the search of the automobile (undertaken pursuant to an inventory search of an abandoned vehicle under the KCPD Tow Policy and after a "plain view" observation of a weapon in the car),

    (3)    the search of 1301 East 79th Street (undertaken after consent-to-search was obtained), and

    (4)    the statement given by Crosdale to Det. Castelleto (given after a knowing and voluntary waiver of *Miranda* rights),

is that these law enforcement actions are "fruits of the poisonous tree," all flowing from an alleged improper and unconstitutional initial encounter between officers and Crosdale in the McDonald's drive-through line.  Inasmuch as the Court finds that encounter did not run afoul of the Constitution, the Court recommends denial of Crosdale's motion to suppress.

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ."  U.S. CONST. amend. IV.  As made clear in the express language of the Fourth Amendment, however, the Constitution does not forbid all searches and seizures, but only <u>unreasonable</u> searches and seizures.  *Elkins v. United States*, 364 U.S. 206, 222, 80 S.Ct. 1437, 1446 (1960).  In this case, the actions of law enforcement were reasonable under the totality of the circumstances.

Initially, the Court must briefly address the government's contention that the encounter at the McDonald's was consensual and did not constitute a seizure. While consensual encounters with law enforcement do not implicate the Fourth Amendment:

> A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement through means intentionally applied.

*Brendlin v. California*, 551 U.S. 249, 254, 127 S. Ct. 2400, 2405 (2007). *See also United States v. Mabery*, 686 F.3d 591, 595–96, 2012 WL 3030577 (8th Cir. 2012). But there is no seizure if a law enforcement officer "pulled his vehicle behind [the defendants'] parked car and activated his amber warning lights [where] the two cars were the only vehicles in the area, [the officer] was the only law enforcement officer on the scene, he did not block the [the defendants'] vehicle or in any manner preclude them from leaving, he did not draw his weapon, and his tone of voice was inquisitive rather than coercive." *United States v. Dockter*, 58 F.3d 1284, 1287 (8th Cir. 1995). However, as shown by Sgt. Dorothy's diagram, the officers' approach to the Malibu (shown as "Veh 1" in the diagram) was significantly different in this case:



The Court finds that the initial action of the law enforcement officers in approaching the Malibu at the McDonald's was not a consensual encounter but, in fact, was a traffic stop. To that end, "[a] traffic stop constitutes a seizure under the Fourth Amendment." *United States v. Peralez*, 526 F.3d 1115, 1119 (8th Cir. 2008).

In a traffic stop case, the primary inquiry appropriate to determining the lawfulness of the traffic stop is whether there was a pre-existing sufficient quantum of evidence to justify the stop. In the typical case, this inquiry presents no significant issue, inasmuch as most traffic stops are made based upon the direct observations of unambiguous conduct or circumstances by the stopping officer. More to the point, in most of the traffic stop cases, the stop will have been made on full probable cause because an officer observed the vehicle commit an actual traffic offense. *United States v. Lyons*, 486 F.3d 367, 371 (8th Cir. 2007) ("[I[t is well established that a traffic violation – however minor – creates probable cause to stop . . . a vehicle."). However, in this case, the officers had not seen the Malibu involved in a traffic violation at the time the traffic stop was initiated. Nonetheless, the courts have also permitted traffic stops for less than probable cause – specifically, employing the reasonable suspicion standard of *Terry v. Ohio*:[2]

> Because a brief traffic stop is a relatively minor intrusion on the motorist's privacy interests, its Fourth Amendment reasonableness is judged by the standard that applies to investigatory stops – whether the officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot. An officer with reasonable suspicion may stop the automobile and may question the driver to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions.

*Johnson v. Crooks*, 326 F.3d 995, 998 (8th Cir. 2003) (*citations and internal punctuation omitted*).

---

[2]     392 U.S. 1, 22, 88 S. Ct. 1868, 1880 (1968).

In the case at hand, the officers initiating the traffic stop of the Malibu believed that the vehicle was being driven by "Kevin Connor" who had an outstanding arrest warrant. In general, law enforcement officers may stop a vehicle if they believe its owner or occupants have an outstanding warrant for their arrest. *United States v. Shields*, 519 F.3d 836, 837 (8th Cir. 2008) (officers justified in stopping vehicle where they believed occupant of vehicle had a valid warrant for his arrest); *United States v. Barlow*, 308 F.3d 895, 898 (8th Cir. 2002) (officer justified in stopping vehicle registered to a man with a warrant for his arrest).[3]

Of course, "Kevin Connor" was not in the Malibu in this case. However, the law is well-settled in the Eighth Circuit that "the validity of a [traffic] stop depends on whether the officer's actions were objectively reasonable in the circumstances, and in mistake cases, the question is simply whether the mistake, whether of law or of fact, was an objectively reasonable one." *United States v. Smart*, 393 F.3d 767, 770 (8th Cir. 2005). To that end:

> The determination of whether probable cause [or reasonable suspicion] existed is not to be made with the vision of hindsight, but instead by looking to what the officer reasonably knew at the time.

*Id*. (*quoting United States v. Sanders,* 196 F.3d 910, 913 (8th Cir.1999)) (*parenthetical included in original*).

---

[3]     In *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391 (1979), the Supreme Court specifically noted that "stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment" with the <u>exception</u> of:

> those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or <u>an occupant is otherwise subject to seizure for violation of law</u>.

*Id*. at 661, 99 S.Ct. at 1400.

8

Based upon the specific circumstances presented in this case, the Court finds that the officers initiating the traffic stop of the Malibu in the drive-through line at the McDonald's were objectively reasonable in believing that "Kevin Connor" was driving the Malibu. As such, those officers were permitted to "conduct a brief, investigatory stop [based on] a reasonable, articulable suspicion that the individual [being stopped was] involved in criminal activity." *United States v. Gilliam*, 520 F.3d 844, 846 (8th Cir. 2008). *See also United States v. Thomas*, 524 F.3d 855, 859 (8th Cir. 2008) ("A brief stop of a suspicious individual, in order to determine his identity . . . may be most reasonable in light of the facts known to the officer at the time."). The underlying mistaken identity does not invalidate the otherwise permissible investigatory stop. *Id*. at 858 (stop justified because officers thought defendant resembled photograph of murder suspect officers were actively seeking and defendant was traveling on bus that officers believed murder suspect may have been riding).

In response to the officers' efforts to conduct a brief investigatory stop, Crosdale made the decision to pull out of the drive-through line and thereby hit another vehicle and drive away from the scene of the accident. Crosdale's decision triggered a series of circumstances that led to the legal arrest of Crosdale, the legal search of the Malibu, the legal search of the residence at 1301 East 79th Street, and the legal custodial interrogation of Crosdale. Accordingly, it is

**RECOMMENDED** that the Court, after making an independent review of the record and applicable law, enter an order **DENYING** the MOTION TO SUPPRESS EVIDENCE AND STATEMENT [Doc. 47] filed by Rashidi Crosdale on March 24, 2019.

Counsel are reminded that each has 14 days from the date of receipt of a copy of this report and recommendation to file and serve specific objections to the same. A failure to file and

serve timely objections shall bar attack on appeal of the factual findings in this report which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

<u>/s/ John T. Maughmer</u>
**John T. Maughmer**
**United States Magistrate Judge**