IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RASHIDI CROSDALE,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 18-00015-01-CR-W-BP |

**ORDER AND OPINION (1) ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION AND (2) DENYING DEFENDANT'S MOTION TO DISMISS THE SECOND SUPERSEDING INDICTMENT**

Defendant Rashidi Crosdale has been charged in a Second Superseding Indictment with one count each of (1) possessing PCP with the intent to distribute, (2) possessing a firearm in furtherance of the drug trafficking crime charged in Count I, and (3) being a felon in possession of a firearm. (Doc. 115.) He filed a Motion to Compel Discovery, (Doc. 134), that included a request that the charges against him be dismissed as a discovery sanction. The Honorable Jill A. Morris, United States Magistrate Judge for this District, held a hearing on July 6, 2021, and issued a Report on July 14 recommending that the request to dismiss the charges be denied. Defendant filed objections to the Report.

The Court has conducted a de novo review as required by 28 U.S.C. § 636(b)(1) and has reviewed the parties' submissions to Judge Morris, the transcript of the hearing and the exhibits admitted during the hearing. The Court has also considered Defendant's objection to the Report. Having conducted this de novo review the Court now adopts the Report as the Order of the Court and denies the Motion to Dismiss; the Court's discussion is intended to augment, not replace, the Report's recommended findings and conclusions.

Understanding the issues requires a brief discussion of Defendant's Motion to Suppress, filed in March 2019. A Report and Recommendation was issued in September 2019, (Doc. 75),[1] and the Court adopted the Report and denied the Motion to Suppress in November 2019. (Doc. 84.)[2] In doing so, the Court summarized the facts as follows:

> On or about January 4, 2018, two individuals made a report with the Kansas City (Missouri) Police Department, ("KCPD"), reporting that three armed, black males had robbed their house in December 2017 and took over the residence. On January 5, 2018, Sergeant Andrew Dorothy read that report. He drove past the house in question and observed a black Malibu parked outside. The plates were registered to Izetta Brunson. Further investigation revealed that Brunson was involved in a narcotics investigation with her boyfriend, Kevin Conner, and that there was an outstanding warrant from Jackson County for Conner's arrest.
>
> At the time Sergeant Dorothy supervised a squad of six officers. On January 9, 2018, Sergeant Dorothy briefed the other members of his squad, and a plan was developed to watch for Conner, arrest him, and have the complaining individuals observe Conner in a lineup. During the briefing the members of the squad were shown pictures of Conner obtained from Conner's driver's license records at the Department of Revenue and provided basic identifying information (such as height, weight and race). Two members of the squad, acting undercover, watched the residence from unmarked cars; during the surveillance one of them (Sergeant Justin Palmer) observed a person generally matching Conner's description leave the house accompanied by a female juvenile, get in the Malibu, and drive away. Sergeant Palmer was unable to confirm that the driver was Conner; his original observation was from half a block away, and the Malibu had tinted windows and the driver was reclined in his seat.
>
> Sergeant Palmer followed the Malibu and radioed his observations to the other squad members, including Officers Bobbie King and James Oakes, who were in a marked police car. The Malibu entered the drive-through at a McDonalds, and Sergeant Palmer parked in the parking lot. When Officers King and Oakes arrived, there were cars in front of and behind the Malibu; the officers activated the patrol car's lights and brought their patrol car next to the Malibu to block it in the drive-through lane. Officer Oakes exited the car to approach the Malibu, but the Malibu drove through the blockade. In doing so it hit the car in front of it, hit a guard rail adjacent to the drive-through lane (knocking it into another car), went across multiple lanes of traffic to cross the street, and ended up

[1] The Report and Recommendation was issued by the Honorable John T. Maughmer, United States Magistrate Judge for this District.

[2] Shortly after the Motion to Suppress was denied, Defendant's request to proceed pro se was granted. (Doc. 86.)

> at a grocery store parking lot across the street. The driver then ran from the car and was eventually apprehended in a parking lot for a nearby business. It was at this time the officers learned that they had arrested Defendant and not Conner. Defendant was arrested for fleeing the scene of an accident and fleeing from the police; a computer check also revealed that there were outstanding warrants for Defendant's arrest.
>
> Meanwhile, Sergeant Dorothy arrived where the Malibu had come to a stop in the grocery store's parking lot. He saw the female juvenile outside the car, crying, and the Malibu's door was open. He looked inside to see if there was anyone else in the car and saw a Glock semiautomatic handgun between the driver's seat and the center console. The Malibu was eventually towed, and an inventory search revealed a rifle with a hundred-round clip magazine.

(Doc. 84, pp. 1-3.) These findings are substantially the same as those that were alleged by Defendant; he argued that these facts did not justify the stop in the McDonalds drive-through. The Court disagreed, holding that "[t]hese facts gave the officers a reasonable suspicion that the person they were observing was Conner [for whom there was an outstanding arrest warrant], and they were justified in stopping him to confirm or dispel that suspicion." (Doc. 84, p. 5.) The Court also held that the fact that the officers blocked Defendant's car and approached him with guns drawn did not transform the stop into an arrest. (*Id.*)

Separately, Defendant has been seeking dash cam videos from the police vehicles involved. At issue is the video from the car driven by Officers King and Oakes. The Report details the many steps taken to locate this dash cam video, and while the Court adopts these facts a summary is sufficient for present purposes. The search for videos began the day after Defendant was arrested and relevant videos were found in January 2018, but the video from King's and Oakes's car was not among them even though King verbally stated, and completed paperwork reflecting, that there was a video from the patrol car's dashcam. Over the ensuing years several attempts were made to find the video; some attempts were made at Defendant's insistence, and some were made following conversations between the United States Attorney's

Office and the Kansas City Police Department, ("KCPD"). The KCPD concluded that damage to the video or another technological defect had interfered with the video's storage, but that there was no question that the video was not on the KCPD's system.

The video's true fate was not ascertained until May 2021. At that time, it was discovered that when the video was logged it was logged under an incorrect case report number in that two numbers had been transposed inadvertently: instead of logging the dash cam video under the number "18-002094," it had mistakenly been logged under number "18-002904." Unfortunately, nobody had requested that video for case report number 18-002904 be preserved, and pursuant to KCPD's retention policies, the video had been purged from the system and could not be retrieved.

Defendant argues that the destruction of the video requires that the charges against him be dismissed. "The Supreme Court has held that unless a defendant can show bad faith on the part of police, failure to preserve potentially useful evidence does not constitute denial of due process of law. Moreover, the evidence must have had apparent exculpatory value and comparable exculpatory evidence must not have been reasonably available to the defendant." *United States v. Webster*, 625 F.3d 439, 446 (8th Cir. 2010) (cleaned up); *see also United States v. Tyerman*, 701 F.3d 552, 560 (8th Cir. 2012) (citing *California v. Trombetta*, 467 U.S. 479, 489 (1984)).[3] The Court agrees with the Report that (1) the video has no evidentiary value and (2) even if it did, the KCPD did not act in bad faith.

First, it must be noted that the charges against Defendant involve his possession of firearms and his possession of PCP with the intent to distribute. The dashcam video has no

[3] Defendant also invokes *Brady v. Maryland*, 373 U.S. 83 (1963), which requires the prosecution to provide the defendant with all evidence that is material to guilt or punishment. This dovetails with the analysis described in the text, in that whether destruction of evidence violates Due Process depends in part on whether the evidence has exculpatory value. In any event, the video's potential evidentiary value will be addressed.

bearing on these charges; it would not have helped prove them and it certainly would not help disprove them. Defendant accurately describes the video as demonstrating what happened in the McDonalds drive-through – but those events have no bearing on Defendant's guilt or innocence. And significantly, Defendant does not argue otherwise; instead, he argues that the video contained evidence relevant to his suppression motion. Specifically, he contends that that the video would prove that the officers blocked his car and approached with guns drawn, and that before then the officers did not have probable cause to arrest him. (Doc. 185, pp. 9-10, 16.) The Court observes that the facts Defendant argues he could prove with the video were (1) already proved with testimony and more importantly (2) found to be true by the Court when it ruled on Defendant's Motion to Suppress. That is, the Court found (as Defendant contended then) that the officers blocked Defendant's car, approached with weapons drawn, and ordered him to get out of the car. In short, according to Defendant the video would only confirm facts that the Court already found to be true, so the video has no value. Furthermore, the Court did not hold that the officers had probable cause to arrest him in the McDonalds drive-through; the Court held that they had reasonable suspicion to stop him and confirm his identity based on facts developed before the stop at the McDonalds drive-through and that would not be depicted on the video; the fact that the officers did not have probable cause to arrest Defendant (until he drove through the blockade) would not affect the analysis.

The Court also finds that the Government generally, and the KCPD specifically, did not act in bad faith. Defendant devotes most of his objection to chronicling his many requests for the video, the KCPD's efforts to find the video, and the many indications that a video existed. These facts are well-described in the Report which, as stated, the Court adopts. However, the Court interprets these facts differently than does Defendant. The Court finds that the KCPD worked

diligently to find the video; the fact that they did not (and the related fact that they did not figure out the video had been misnumbered due to human error) before the video was deleted as part of the KCPD's routine policies does not demonstrate bad faith.

In conclusion, the Court concludes that the video's destruction did not violate Defendant's Due Process rights for two reasons. First, the video would not have depicted anything material to Defendant's guilt or innocence or affect any rulings that have been made in this case. Second, the destruction of the video was not the product of bad faith. Therefore, the Court adopts the Report and Recommendation, (Doc. 181), and denies Defendant's request to dismiss the Second Superseding Indictment, (Doc. 134).

The Clerk of Court shall mail a copy of this Order to:

Rashidi Crosdale
21412-045
Core Civic
100 Highway Terrace
Leavenworth, KS 66048

**IT IS SO ORDERED.**

/s/ Beth Phillips
BETH PHILLIPS, CHIEF JUDGE
UNITED STATES DISTRICT COURT

DATE: August 17, 2021